IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 21-cv-00996-NYW-NRN

PEGGY STANLEY,

     Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

     Defendant.

---

## ORDER

This matter comes before the Court on Defendant State Farm Mutual Automobile Insurance Company's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) ("Rule 12(c) Motion"), [Doc. 23, filed April 29, 2022], and Motion for Partial Summary Judgment (collectively, the "Motions"), [Doc. 24, filed April 29, 2022].  Upon review of the Motions and corresponding briefing, the entire docket, and applicable legal standards, the Court finds that oral argument would not materially assist in the resolution of these matters.  For the reasons set forth herein, Defendant's Motion for Partial Summary Judgment is respectfully **GRANTED**, and the Rule 12(c) Motion is **DENIED as moot**.

## BACKGROUND

This action arises from a motor vehicle collision on July 5, 2020 (the "Collision") between Plaintiff Peggy Stanley ("Ms. Stanley" or "Plaintiff") and non-party Christine Hannahs ("Ms. Hannahs" or the "tortfeasor").  Plaintiff settled with Ms. Hannahs's insurer, Progressive, for her liability limit of $25,000, and also sought underinsured motorist ("UIM") benefits through her insurer, Defendant State Farm ("Defendant" or "State Farm").  After State Farm denied Plaintiff's

request for UIM benefits, she initiated this action by filing a Complaint against State Farm in Summit County District Court on February 16, 2021.  *See* [Doc. 5].[1]  In the Complaint, Ms. Stanley asserts three claims against State Farm: (1) breach of contract (Count I); (2) statutory unreasonable delay or denial under Colo. Rev. Stat. § 10-3-1116 (Count II); and (3) common law bad faith breach of insurance contract (Count III).  [*Id.* at 4–5].  On April 8, 2021, State Farm removed the case to the United States District Court for the District of Colorado based on diversity jurisdiction. *See* [Doc. 1].

Following the close of discovery, on April 29, 2022, State Farm filed the instant Motions. [Doc. 23; Doc. 24].  Plaintiff responded to both Motions on May 20, 2022, [Doc. 26; Doc. 27], and State Farm replied on June 13, 2022, [Doc. 28; Doc. 29].  Thereafter, this action was reassigned to the undersigned United States District Judge upon her appointment.  [Doc. 34].  The Motions are thus ripe for disposition.

## LEGAL STANDARDS

### I.    Federal Rule of Civil Procedure 12(c)

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) may be filed only "[a]fter the pleadings are closed."[2]  Fed. R. Civ. P. 12(c).  A Rule 12(c) Motion is evaluated under the same standard applicable to a Rule 12(b)(6) motion to dismiss.  *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223–24 (10th Cir. 2009).  The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after

---

[1] The Complaint also names Adrianna Douglas as a defendant, *see* [Doc. 5 at 1], but Ms. Douglas was dismissed as a defendant the same day State Farm removed this action to this Court. *See* [Doc. 7].

[2] "Pleadings are closed within the meaning of Rule 12(c) if no counter or cross claims are at issue when a complaint and an answer have been filed."  *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 60 (D.D.C. 2007); Fed. R. Civ. P. 7(a).

taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "[T]o state a claim in federal court, a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). The Court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). However, the Court considers a broader factual record when evaluating a Rule 12(c) motion; the Court is not limited to the well-pled allegations contained in the Complaint but instead considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *see also Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017) ("A Rule 12(c) motion considers the defendants' answers together with the complaint[.]"); *Hous. Auth. Risk Retention Grp., Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004) ("In a motion for judgment on the pleadings, the Court considers the pleadings alone, which consist of the complaint, the answer, and any written instruments attached as exhibits.").

A court should not grant a Rule 12(c) motion unless "the moving party clearly establishes that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Ciber, Inc. v. ACE Am. Ins. Co.*, 261 F. Supp. 3d 1119, 1125 (D. Colo. 2017) (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)). Indeed, a motion for a judgment on the pleadings "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district

court."  5C Charles Alan Wright et al., Federal Practice & Procedure § 1367 (3d ed., Apr. 2019 update).  However, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Benzor v. Geico Cas. Co.*, No. 21-cv-00282-PAB-NRN, 2021 WL 4439789, at *2 (D. Colo. Sept. 27, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## II.   Federal Rule of Civil Procedure 56

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient.  *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or

determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

As a preliminary matter, Defendant seeks the same relief, albeit on different grounds, in its Rule 12(c) Motion and Motion for Partial Summary Judgment—that is, dismissal of Plaintiff's statutory unreasonable delay or denial claim under Count II and common law bad faith breach of insurance contract claim under Count III. [Doc. 23; Doc. 24]. In the latter Motion, Defendant contends that the Court should review its Rule 12(c) Motion first, "which would render [the Motion for Partial Summary Judgment] unnecessary." [Doc. 24 at 1]. However, Defendant acknowledges the different legal standards used to evaluate each motion, noting that its Rule 12(c) Motion focuses on the operative pleading and argues that "Plaintiff's Complaint failed to state a claim upon which relief can be granted." [*Id.*]. Thus, it is unclear why Defendant waited to raise its Rule 12(c) Motion until the same day it moved for partial summary judgment—well after the close of discovery—nor does Defendant cite any authority explaining why this Court should consider the Rule 12(c) Motion before the Motion for Partial Summary Judgment, which was filed with

supporting evidence. The Tenth Circuit has explained that "[a]lthough a motion for judgment of the pleadings can be filed at any time before trial, nothing in the language of the rule implies that the motion must be disposed of prior to other pending motions, including a motion for summary judgment." *S.E.C. v. Wolfson*, 539 F.3d 1249, 1264 (10th Cir. 2008). Nor does it promote judicial efficiency for this Court to be focused upon the sufficiency of a pleading well after the close of discovery. *See* Fed. R. Civ. P. 1. Accordingly, the Court limits its analysis below to the Motion for Partial Summary Judgment. *See Wolfson*, 539 F.3d at 1265 (concluding that the district court did not err in denying the defendants' Rule 12(c) motion that was filed after the parties had moved for summary judgment, noting, *inter alia*, that "[f]or all purposes relevant to [the] case, the time for properly testing the sufficiency of the complaint had passed" and "under Rule 12(d), the district court was obligated to decide the liability issues by reference to the admissible evidence presented by the parties, rather than solely by reference to the complaint's allegations").

## I.    Undisputed Material Facts

The Court identifies the following undisputed facts as material for purposes of resolving the Motion for Partial Summary Judgment.

1.    Plaintiff was involved in the Collision on July 5, 2020. [Doc. 24 at ¶ 1; Doc. 26 at ¶ 1; Doc. 24-1].

2.    At the time of the Collision, Plaintiff was driving a 2008 Ford F250 pickup registered to the Seymour Lodging Corporation. The other driver involved in the accident was Ms. Hannahs. [Doc. 24-1].

3.    The F250 driven by Plaintiff was insured under a State Farm policy purchased by Dick and Karen Seymour, policy number 484-0065-B24-06 (the "Primary Policy"). The Primary Policy did not include coverage for UIM benefits. [Doc. 24-2; Doc. 24 at ¶ 3; Doc. 26 at ¶ 3].

4. At the time of the Collision, Ms. Hannahs was insured under a personal injury liability insurance policy issued by Progressive Insurance ("Progressive"), with an applicable limit of $25,000 per injured person. [Doc. 24 at ¶ 4; Doc. 26 at ¶ 4].

5. On September 16, 2020, Plaintiff's counsel sent a letter of representation to State Farm, notifying it that Plaintiff was receiving medical treatment for injuries she purportedly sustained in the Collision and that Plaintiff believed Ms. Hannahs may not have had sufficient liability insurance coverage to fully compensate her for all damages resulting from the accident, among other information. [Doc. 24-4; Doc. 24 at ¶ 6; Doc. 26 at ¶ 6]. The letter "did not provide any additional details about Plaintiff's injuries, the nature of her treatment, or the amount of medical expenses that she had incurred." [Doc. 24 at ¶ 6; Doc. 26 at ¶ 6]; *see also* [Doc. 24-4].

6. By letter dated September 21, 2020, State Farm UIM Claims Specialist Adrianna Douglas ("Ms. Douglas") acknowledged receipt of the September 16 letter, and also informed Plaintiff that the Primary Policy for the Ford F250 did not have UIM coverage. [Doc. 24-5; Doc. 24 at ¶¶ 7–8; Doc. 26 at ¶¶ 7–8]. However, Ms. Douglas informed Plaintiff that State Farm was "reviewing for other policies in force on the date of loss with State Farm Insurance." [Doc. 24-5 at 1]. Ms. Douglas also advised Plaintiff that her claim may be delayed "[i]f we are unable to obtain information needed to investigate" her claim. [*Id.*].

7. On September 25, 2020, State Farm Claims Medical Payments Claims ("MPC") Specialist Barb Huffman ("Ms. Huffman") sent another letter to Plaintiff's counsel acknowledging receipt of the September 16 letter. [Doc. 24-6]. That letter also enclosed an Authorization for Release of Information form for Plaintiff to sign and return to State Farm to obtain her medical records. [*Id.*; Doc. 24 at ¶ 9; Doc. 26 at ¶ 9].

8.      On September 30, 2020, Ms. Douglas determined that Plaintiff was insured under a separate policy purchased by Dick and Karen Seymour for a 2004 Mercedes E320, policy number 084-5903-C26-06B (the "Secondary Policy" or "Policy").  [Doc. 24-7; Doc. 24-8 at 63:6–9; Doc. 24 at ¶ 10; Doc. 26 at ¶ 10].  The Secondary Policy included UIM coverage.  [Doc. 24 at ¶¶ 5, 10; Doc. 26 at ¶¶ 5, 10].

9.      On November 19, 2020, Plaintiff's counsel sent an email to State Farm requesting consent to settle with Progressive for the limits of Ms. Hannahs's liability insurance policy.  "This email did not include any details about Plaintiff's damages or medical treatment."  [Doc. 24 at ¶ 11; Doc. 26 at ¶ 11; Doc. 24-9].  On November 27, 2020, State Farm "consent[ed] to the settlement of the $25,000.00 policy limits of Progressive's liability policy with [its] insured, Peggy Stanley."  [Doc. 24 at ¶ 12; Doc. 26 at ¶ 12; Doc. 24-10].

10.     On December 2, 2020, Plaintiff's counsel sent a letter to State Farm regarding Plaintiff's medical bills, stating, "[t]o date, we have obtained medical expenses in the amount of $3,793.00," including $3,081.00 in bills from Howard Head Sports Medicine Center and $712.00 from Centura Health Physicians Group.  [Doc. 24 at ¶ 13; Doc. 26 at ¶ 13; Doc. 24-11].

11.     On December 14, 2020, Plaintiff's counsel sent a follow-up letter with additional medical bills to State Farm.  [Doc. 24-12].  The letter stated that Plaintiff had incurred an additional $6,431.00 in medical expenses from High Country Healthcare.  [*Id.*; Doc. 24 at ¶ 14; Doc. 26 at ¶ 14].

12.     On December 18, 2020, Plaintiff's counsel sent another letter to State Farm stating that Plaintiff had incurred an additional $3,377.82 in medical expenses from Howard Head Sports Medicine, thus bringing Plaintiff's total claimed medical expenses at the time to $13,601.82.  [Doc. 24 at ¶ 15; Doc. 26 at ¶ 15; Doc. 24-13].

13.     The December 2, 14, and 18 letters were directed to Ms. Huffman, and each contained the following request:

> We request that you review the enclosed documents in conjunction with anything that you have obtained in your own investigation, and tender the benefits owed at this time in compensation of Ms. Stanley's injuries, damages, and losses.  If you are unable to respond within 30 days, please let us know how much additional time is needed and the reason for the delay.  If there is additional information that will assist in your evaluation, please let us know.

[Doc. 24-11; Doc. 24-12; Doc. 24-13].

14.     On December 22, 2020, State Farm issued Medical Payments coverage benefits to Plaintiff for $10,000, the limit of her coverage.  [Doc. 24-14; Doc. 24 at ¶ 16; Doc. 26 at ¶ 16].

15.     On December 27, 2020, Ms. Douglas, the UIM Claim Specialist, responded to Plaintiff's counsel's letters, stating as follows:

> I am in receipt of your time limit demand for request for benefits.  At this time, with the information on file, we do not believe there is an Underinsured Motorist Exposure. *If you believe there is an exposure and submit additional documentation, please submit five years of prior records for your client.*  This will assist in the evaluation of the injuries sustained.  *If you wish for State Farm to secure the prior records, an Authorization for Release of Information and medical provider's summary sheet are included.*  Please have your client complete these items and return to us.

[Doc. 24 at ¶ 17; Doc. 26 at ¶ 17; Doc. 24-15 (emphasis added)].

16.     On December 30, 2020, by email direct to "Ms. Huffman" (i.e., the MPC Claims Specialist) Plaintiff's counsel provided State Farm a signed Authorization for Release of Information, as well as a "Medical Provider/Health Carrier Information" form and an "Injury Questionnaire." [Doc. 24-16; Doc. 26-2].  This was the first time that Plaintiff's counsel provided these forms since Ms. Huffman first requested them on September 25, 2020.  [Doc. 24 at ¶ 18; Doc. 26 at ¶ 18]; *see also* [Doc. 24-6].

17.     On February 11, 2021, Plaintiff's counsel sent another letter to State Farm with additional bills and medical records.  [Doc. 24-17].  This letter stated that Plaintiff had incurred

$1,800 in additional medical expenses, thus bringing Plaintiff's total claimed medical expenses, as of that date, to $15,401.82.  [*Id.*; Doc. 24 at ¶¶ 19–20; Doc. 26 at ¶¶ 19–20].

18.     Like the letters on December 2, 14, and 18, 2020, the February 11, 2021 letter was also directed to MPC Claims Specialist Ms. Huffman and requested that State Farm "review the enclosed documents in conjunction with anything that you have obtained in your own investigation, and tender the benefits owed at this time in compensation of Ms. Stanley's injuries, damages, and losses."  [Doc. 24-17].  The February 11 letter also imposed a 21-day response deadline, stating that "[i]f you are unable to respond within 21 days, please let us know how much additional time is needed and the reason for the delay."  [*Id.*; Doc. 24 at ¶ 21; Doc. 26 at ¶ 21].

19.     Despite Plaintiff's 21-day response deadline, on February 16, 2021—i.e., five days after Plaintiff's counsel sent State Farm the February 11 letter—Plaintiff filed suit against State Farm.  [Doc. 24 at ¶ 22; Doc. 26 at ¶ 22; Doc. 5].

20.     None of Plaintiff's letters to State Farm contained a demand for any specific amount of money, but rather requested State Farm "tender the benefits owed at this time in compensation for Ms. Stanley's injuries, damages, and losses," *e.g.*, [Doc. 24-13], and the only information Plaintiff's counsel provided were Plaintiff's medical records and bills which, pre-suit, totaled $15,401.82.  [Doc. 24 at ¶ 24; Doc. 26 at ¶ 24].

## II.   Discussion

State Farm seeks summary judgment as to Plaintiff's statutory unreasonable delay or denial and common law bad faith claims under Counts II and III, respectively, on the grounds that there is no evidence showing that State Farm acted unreasonably in handling Plaintiff's claim for UIM benefits, knowingly or recklessly denied the claim, or disregarded the validity of the claim.  [Doc. 24 at 3].  According to State Farm, Ms. Stanley cannot show that State Farm acted unreasonably in light of the information available before Ms. Stanley filed suit.  [*Id.* at 9–13].  For support, State

10

Farm argues, *inter alia*, that Ms. Stanley "did not provide sufficient documentation to establish that prior to litigation her damages exceeded the amount of the underlying liability settlement, and . . . failed to provide State Farm with sufficient time to investigate her claim after finally providing signed medical release authorization forms immediately before filing suit."  [*Id.* at 3].

### A.      Legal Framework

Colorado law provides for two types of claims based on an insurer's unreasonable conduct throughout the claims process: (1) statutory unreasonable delay or denial, and (2) common law bad faith breach of insurance contract (collectively, "bad faith claims").  First, a statutory claim arises when an insurer delays or denies payment to its insured without a reasonable basis.  *See* Colo. Rev. Stat. § 10-3-1115(1)(a); *Canady v. Nationwide Affinity Ins. Co. of Am.*, No. 19-cv-00344-RBJ, 2020 WL 376494, at *3 (D. Colo. Jan. 23, 2020).  To prove a claim of unreasonable delay or denial, an insured must demonstrate that: (1) the insurer delayed or denied payment of benefits to the insured, and (2) the delay or denial was without a reasonable basis.  *See Am. Family Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185–86 (Colo. 2018); *see also Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 568 (Colo. App. 2015) (defining an unreasonable denial as "when an insurer denies a claim outright" and an unreasonable delay as "when the insurer pays on a claim but disputes the value of that claim, thereby delaying payment of the claim's full value").

Second, under Colorado law, an insurer owes its insured a "non-delegable duty of good faith and fair dealing," and the breach of that duty gives rise to a separate cause of action based in common law tort principles.  *TAF, L.L.C. v. Hartford Fire Ins. Co.*, 549 F. Supp. 2d 1282, 1289 (D. Colo. 2008) (citations omitted).  To establish a common law bad faith claim, the insured must demonstrate "that (1) the insurer's conduct was unreasonable, and (2) the insurer either had knowledge of or reckless disregard for the fact that its conduct was unreasonable."  *Kisselman v.*

*Am. Family Mut. Ins. Co.*, 292 P.3d 964, 970 (Colo. App. 2011) (citation omitted); *see also Soicher*, 351 P.3d at 565 (stating that "an insurer has a duty to investigate and adjust claims in good faith"). "Whether an insurer has in bad faith breached its duties to an insured is a question of reasonableness; in other words, would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances." *TAF*, 549 F. Supp. 2d at 1289 (quotation omitted); *see also Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1219 (Colo. App. 2010). Accordingly, a common law bad faith claim "requires a determination of the reasonableness of an insurance compan[y's] denial or delay in paying a claim," and, therefore, "necessarily goes to the handling of a claim." *TAF*, 549 F. Supp. 2d at 1289.

Nevertheless, and for the purposes of this Order, the legal standard between these claims is only "slightly different" because "[i]n the statutory claim, the only element at issue is whether the insurer denied benefits without a reasonable basis; whereas, a common law claim must show both unreasonableness and that the insurer knew that its conduct was unreasonable or recklessly disregarded that fact." *Wagner v. Am. Family Mut. Ins. Co.*, 569 F. App'x 574, 579–80 (10th Cir. 2014). The reasonableness of the insurer's conduct is viewed objectively. *Sanderson*, 251 P.3d at 1217.

### B.   Defendant is Entitled to Summary Judgment on Plaintiff's Claims Under Counts II and III.

Because reasonableness is a common element of both claims, the Court begins and ends its analysis there. In its Motion for Partial Summary Judgment, State Farm argues that no reasonable jury could find that State Farm acted unreasonably (1) in the initial stage of its claims-handling process before December 27, 2020; (2) by informing Plaintiff on December 27, 2020 that it did not believe that Plaintiff was owed UIM benefits at that time and requesting additional information; and (3) by not issuing payment of benefits before Plaintiff filed suit five days after

her counsel sent the fourth demand letter on February 11, 2021. [Doc. 24 at 10–12]. In addition, State Farm argues that it did not owe any duty to issue advanced payment of UIM benefits to Ms. Stanley before litigation ensued because the valuation of her claim was subject to reasonable dispute. [*Id.* at 12–13]. State Farm also contends that no reasonable jury could find that it compelled Plaintiff to initiate litigation to recover insurance benefits. [*Id.* at 13–14]. The Court respectfully agrees.

***Conduct before December 27, 2020.*** With respect to the claims-handling process before December 27, 2020, it is undisputed that State Farm received notice of Ms. Stanley's intent to seek UIM benefits on September 16, 2020. *See* [Doc. 24-4]. And then, although the Primary Policy did not include UIM coverage, State Farm determined that UIM coverage existed under the Secondary Policy and notified Plaintiff of the same two weeks later, on September 30, 2020. [Doc. 24 at ¶¶ 2–3, 10; Doc. 26 at ¶¶ 2–3, 10]. Thereafter, on November 27, 2020, State Farm granted Plaintiff consent to settle with the tortfeasor's insurer, Progressive, for the $25,000 liability limits under that policy. [Doc. 24-10]. Next, between December 2 and December 18, 2020, Plaintiff's counsel notified State Farm that Plaintiff had incurred $13,601.82 in medical expenses. [Doc. 26 at ¶¶ 13–15; Doc. 26 at ¶¶ 13–15]. Subsequently, by letter dated December 27, 2020, State Farm notified Plaintiff that, based on "the information on file" at the time, it did not believe that there was UIM exposure for the Collision, but also requested that Plaintiff "submit additional documentation" and "five years of prior records" if she believed otherwise. [Doc. 24-15]. Further, Plaintiff does not identify any issues with State Farm's conduct before December 27, 2020. *See generally* [Doc. 26].[3]

---

[3] Ms. Stanley acknowledges State Farm's argument "that no reasonable jury could find State Farm acted unreasonably *by December 27, 2020*," and counters that "by December of 2020, State Farm knew Ms. Stanley had suffered both physical and psychological injuries and was continuing to

***Conduct on and after December 27, 2020.***   State Farm argues that as of December 27, 2020, Plaintiff had submitted only $13,601.82 in past medical bills to State Farm, but she "did not submit any documentation of lost wages or other medical expenses, or demand any other specific amounts other than the medical expenses set forth in her letters." [Doc. 24 at 11, 13]. State Farm claims it did not owe Ms. Stanley any additional benefits at that time—or before she filed suit—because (1) the economic damages she was claiming vis-à-vis her medical bills were "well below the tortfeasor's liability coverage of $25,000," and (2) Plaintiff's "non-economic damages remained disputed." [*Id.* at 11]; *see also* [*id.* at 13 ("Plaintiff's total claimed economic damages, even at the time the lawsuit was filed, were still only $15,401.82, which was $9,598.18 less than the available liability coverage from the tortfeasor.")]. For support, State Farm asserts that, under Colorado law, "an insurer is not required to make advanced payments of any portion of [a] claim that is subject to reasonable dispute, such as an amount extended as a settlement offer above and beyond the undisputed portion of the claim." [*Id.* at 12–13].

Ms. Stanley counters that State Farm was required to issue advanced payment to her for "ongoing" treatment before she filed suit. *See* [Doc. 26 at 8–13]. For support, she argues, *inter alia*, that "prior to litigation," State Farm had "significant evidence" to support that she "was undergoing ongoing treatment, accruing wage loss damages, experiencing physical impairment and pain/suffering, and being treated for PTSD and psychological symptoms related to the collision." [*Id.* at 11]. Despite such evidence, Plaintiff continues, State Farm did not "adequately

---

receive treatment for these injuries" and yet, "[i]n the face of this information, State Farm chose to close the claim less than 6 months into the claim instead of continuing its investigation." [Doc. 26 at 8 (emphasis added)]. However, this rebuttal is based on Plaintiff's assertion that "*[o]n December 27th, 2020*, Ms. Douglas and State Farm determined that Plaintiff had been fully compensated by the liability coverage and deactivated their file." [*Id.* at 5 (emphasis added)]; *see also* [Doc. 26-1 at 77:14–23]. Accordingly, Plaintiff's arguments regarding State Farm's conduct *on* December 27, 2020 do not constitute genuine disputes regarding what occurred *before* that date.

address, evaluate and pay for these damages, and instead closed its claim while these damages were clearly still accruing." [*Id.* at 12]; *see also* [*id.* at 9 ("A jury could find that failure to consider ongoing medical and psychological treatment was unreasonable.")].  Ms. Stanley also argues that her noneconomic damages were not in dispute as of December 27, 2020, reasoning that "the evaluations by State Farm's claim-handling adjuster . . . indicated that Plaintiff was owed noneconomic damages for her injuries." [*Id.* at 12].  According to Ms. Stanley, her noneconomic damages "were clearly quantifiable because the adjuster assigned those damages certain amounts in her evaluation." [*Id.*].  As explained below, Plaintiff's arguments and proffered evidence fail to raise a genuine issue of material fact regarding State Farm's conduct before she filed suit to support her bad faith claims.

      **1.**     **Delay or Denial of UIM Benefits: Economic Damages vs. Noneconomic Damages.**

The Parties appear to draw a distinction between the *economic* and *noneconomic* UIM benefits that Plaintiff claims State Farm unreasonably delayed or denied paying her.  *See generally* [Doc. 24; Doc. 26; Doc. 28].  Therefore, the Court will begin by analyzing those differences insofar as Plaintiff alleges different unreasonable conduct with respect to each category of damages.

***Economic Damages.***  First, with respect to economic damages, Plaintiff acknowledges State Farm's position that "it did not delay any [UIM] benefits owed because, prior to litigation being filed, Plaintiff's medical bills were less than the liability coverage limits." [Doc. 26 at 11].  Plaintiff contends, however, that State Farm "ignores that [she] was accruing *economic damages* in the form of *ongoing treatment* and *wage loss*, which was clearly documented and communicated to State Farm." [*Id.* at 12 (emphasis added)]; *see also, e.g.,* [*id.* at 9 ("A jury could find that accepting all medical expenses but disputing all noneconomic damage was unreasonable.  A jury

could find that failure to consider ongoing medical and psychological treatment was unreasonable.")].

As previously mentioned, State Farm insists that it was not required to issue UIM benefits for Plaintiff's economic damages as of December 27, 2020, or before she filed suit on February 16, 2021, because the economic damages Plaintiff sought at the time vis-à-vis her medical bills "remained well below the tortfeasor's liability coverage of $25,000." [Doc. 24 at 11]; *see also* [*id.* at 13 ("Plaintiff's total claimed economic damages, even at the time the lawsuit was filed, were still only $15,401.82, which was $9,598.18 less than the available liability coverage from the tortfeasor.")]. This argument appears to relate to State Farm's position in the Rule 12(c) Motion that the Complaint "fails to allege facts that would plausibly establish that Defendant owes benefits under the Policy" because "[a] plaintiff is entitled to UIM benefits [only] when their damages exceed the tortfeasor's liability." [Doc. 23 at 4 (citing *Jordan v. Safeco Ins. Co. of Am., Inc.*, 348 P.3d 443, 446 (Colo. App. 2013))]. Although neither Party explicitly addresses this argument in their briefing on the Motion for Partial Summary Judgment, the Court nevertheless finds it relevant for purposes of resolving the Motion. Indeed, the Parties fully briefed the Rule 12(c) Motion, and Plaintiff acknowledges State Farm's position on this issue throughout her Response to the Motion for Partial Summary Judgment. *See, e.g.*, [Doc. 26 at 8 ("Essentially, State Farm contends that because the face value of Plaintiff's medical bills were less than the liability coverage limits, it did not delay any benefits."); *id.* at 11 ("State Farm claims that it did not delay any benefits owed because, prior to litigation being filed, Plaintiff's medical bills were less than the liability coverage limits.")].

Under Colorado law, "UIM policies do not cover damages up to the liable party's legal liability limit, and instead cover only damages in excess of that limit." *Tubbs v. Farmers Ins.*

*Exch.*, 353 P.3d 924, 927 (Colo. App. 2015); *see also Jordan*, 348 P.3d at 449. Here, Ms. Stanley appears to be seeking economic damages in the form of medical costs already accrued and future reasonable medical costs, past and future loss of earning capacity, and loss of income. *See* [Doc. 26 at 9, 12]. However, it is undisputed that although each of Plaintiff's pre-suit demand letters identified certain amounts of her medical bills, the sum total of those bills as of the filing date of this action did not exceed the $25,000 liability limit that she had already obtained from Progressive. It is also undisputed that none of Plaintiff's pre-suit letters quantified any other amounts that Plaintiff was seeking from State Farm, whether related to additional medical bills, lost wages, or otherwise. *See* [Doc. 24-11; Doc. 24-12; Doc. 24-13; Doc. 24-17]. Instead, each letter requested only that State Farm "*tender the benefits owed at this time in compensation for Ms. Stanley's injuries, damages, and losses*." [Doc. 24-17 (emphasis added)].[4] Further, Plaintiff does not point to any other evidence regarding her purported *economic* damages that State Farm had before she filed suit; nor does she identify any evidence that shows State Farm was cognizant that its ultimate liability was necessarily going to exceed the $25,000 liability limit and be attributable to Plaintiff's collision with Ms. Hannahs. *See* [Doc. 24 at ¶ 24; Doc. 26 at ¶ 24 (Plaintiff admitting that none of her counsel's letters "contained a demand for any specific amount of money, but rather requested State Farm tender benefits owed, and the only information provided was the medical records and bills which, pre-suit, totaled $15401.82.")].

Based on the foregoing undisputed facts, the Court finds that Plaintiff fails to establish a genuine factual dispute on the issue of State Farm's reasonableness with respect to her pre-suit economic damages.

---

[4] Notably, Ms. Stanley claims that as of May 30, 2022—the date she filed her Response to the Motion for Partial Summary Judgment—"[h]er bills alone *now* exceed the liability coverage." [Doc. 26 at 13 (emphasis added)].

***Noneconomic Damages.***  Second, part of Ms. Stanley's bad faith claims—and the primary focus of her Response to the Motion for Partial Summary Judgment—rests on her allegations that State Farm has failed to pay her the full amount of her "quantifiable" noneconomic losses.  *See, e.g.*, [Doc. 26 at 9 ("A jury could find that accepting all medical expenses but disputing all noneconomic damage was unreasonable."); *id.* at 12 (arguing that her "noneconomic damages were clearly quantifiable")].  In the Motion for Partial Summary Judgment, State Farm contends that it was not required to issue payment for Ms. Stanley's noneconomic damages because those amounts were subject to a reasonable dispute before Plaintiff filed suit.  *See* [Doc. 24 at 11–13].

Under Colorado law, an insurer may not withhold payment of *undisputed* benefits.  *State Farm Mut. Auto. Ins. Co. v. Fisher*, 418 P.3d 501, 506 (Colo. 2018) (*Fisher II*) ("[N]othing in the statute requires or supports withholding payment of undisputed covered benefits simply because other portions of an insured's UIM claim remain disputed.").  But "an insurer is not prohibited from withholding payments of disputed benefits, so long as it does not do so without a reasonable basis."  *Albrandt v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-01926-RM-NYW, 2021 WL 5140283, at *2 (D. Colo. Nov. 4, 2021).  Further, "summary judgment is appropriate if the plaintiff fails to establish [s]he is entitled to damages or provide a fair approximation of those damages."  *Palmer v. Owners Ins. Co.*, No. 18-cv-01953-JLK, 2019 WL 7370372, at *6 (D. Colo. Nov. 6, 2019) (citing *Terrones v. Tapia*, 967 P.2d 216, 218 (Colo. App. 1998)).  "An insurer's decision to deny benefits to its insured must be evaluated based on the information before the insurer at the time of that decision."  *Peiffer v. State Farm Mut. Auto. Ins. Co.*, 940 P.2d 967, 970 (Colo. App. 1996), *aff'd and remanded*, 955 P.2d 1008 (Colo. 1998).

Ms. Stanley disagrees that her noneconomic damages were subject to a reasonable dispute before she filed suit.  Specifically, she contends that "State Farm essentially seeks a broad ruling

that noneconomic damages can *never* qualify as 'covered benefits' that an insurer is obligated to pay to an insured because they are inherently debatable." [Doc. 26 at 9 (emphasis in original)]. According to Ms. Stanley, such a request "is nothing more than a repackaged bid to have 'fair debatability'[5] serve as insulation from factual findings of unreasonableness." [*Id.*]. However, she continues, Colorado courts have rejected this type of argument on the basis that "fair debatability of an insurance claim does not render the insurer's delay or denial of payment on that claim reasonable as a matter of law." [*Id.* (citing *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012))].

But Ms. Stanley misapprehends State Farm's position and ignores two prevailing, undisputed issues: (1) that the total amount of economic damages she specified before she filed suit were less than the $25,000 liability limit that she obtained from Progressive; and (2) her demand letters made broad requests for "benefits owed at this time in compensation for Ms. Stanley's injuries, damages, and losses," *e.g.*, [Doc. 24-17], but she does not claim that she *quantified* the amount of *noneconomic* damages she was seeking from Progressive before she filed suit—nor does she proffer evidence of such pre-suit damages here. Notably, "[u]nlike economic damages such as those associated with [Ms. Stanley's] medical bills, there is no sum certain to which an insured is entitled for non-economic damages, which is indicative of the fact that there was a 'legitimate dispute' over the value of such damages." *Nyborg v. State Farm Mut. Auto. Ins.*

---

[5] "Under common law bad faith principles, Colorado courts traditionally find that it is reasonable for an insurer to challenge claims that are 'fairly debatable.'" *Sipes v. Allstate Indem. Co.*, 949 F. Supp. 2d 1079, 1085 (D. Colo. 2013) (citing *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011)). Accordingly, "under common law, finding that an insurer's justification for denying or delaying payment of a claim is 'fairly debatable' typically weighs against finding that an insurer acted unreasonably." *Id.* (citing *Sanderson*, 251 P.3d at 1218).

*Co.*, No. 20-cv-01918-RM-KLM, 2021 WL 662305, at *6 (D. Colo. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1115936 (D. Colo. Mar. 24, 2021).

Nevertheless, Ms. Stanley argues that her "noneconomic damages were clearly quantifiable" before she initiated this action because the UIM Claims Specialist, Ms. Douglas, "assigned those damages certain amounts in her evaluation" and, therefore, State Farm should have issued payment for those damages. [Doc. 26 at 12]. However, the evidence in the record does not reflect that Ms. Douglas or State Farm had quantified Plaintiff's noneconomic damages or that State Farm determined any such noneconomic damages could have been appropriately paid.

First, Plaintiff's argument that State Farm should have issued additional payments based on "significant evidence it had prior to litigation that Plaintiff was undergoing treatment, accruing wage loss damages, experiencing physical impairment and pain/suffering, and being treated for PTSD and psychological symptoms related to the collision," [*id.* at 11], is unsupported by the record. The purported "evidence" referenced by Ms. Stanley consists of the deposition testimony of Ms. Douglas, who was asked at her deposition to interpret the claims notes of *other adjusters* who worked on portions of Plaintiff's claim. *See, e.g.*, [Doc. 26 at ¶¶ 1–3, 5–9; Doc. 28 at ¶¶ 1–3, 5–9; Doc. 26-1 at 39:13–40:24]. That deposition testimony states nothing about whether Plaintiff provided evidence to State Farm regarding her purported noneconomic damages.[6]

---

[6] For instance, Plaintiff asserts that "[o]n September 4, 2020, State Farm was aware that Plaintiff was treating with physical therapy, psychology, massage and other doctors for neck and back injuries" and "taking time off of work to heal from her injuries." [Doc. 26 at 3, ¶¶ 2–3]. However, the deposition testimony she cites states in relevant part as follows:

Q. As part of her September 4th, 2020 note Ms. Huffman documents that Ms. Stanley is treating with physical therapists, doctors, psychologists, massage for neck and back injuries; right?

A. Yes.

Q. . . . [I]t's also documented in Ms. Huffman's note that [Plaintiff] was out of work to heal; right?

Indeed, Plaintiff's Response does not point to medical bills, treatment records, or wage records to support her arguments that State Farm disregarded specific information she submitted. *See, e.g.*, [Doc. 26 at 11–13]. And State Farm's *knowledge* that Plaintiff was "undergoing treatment" and "accruing wage loss damages" is irrelevant to whether Ms. Stanley indeed provided documents to State Farm establishing such treatment and damages before litigation commenced—nor does Ms. Stanley claim she did. *See, e.g.*, [Doc. 26 at 3–4, ¶¶ 2–9 (Plaintiff's assertions that State Farm was aware that she was undergoing treatment solely based on "medpay" (i.e., medical payment) notes that State Farm's UIM adjusters could access and review)].

Second, the record does not support Plaintiff's claims that "the evaluations by State Farm's claim-handling adjuster . . . indicated that Plaintiff was owed noneconomic damages for her injuries," or that those damages "were clearly quantifiable because the adjuster assigned those damages certain amounts in her evaluation." [*Id.* at 12]; *see also* [*id.* at 10 ("State Farm was actually able to determine an evaluation range for Ms. Stanley's claim that included noneconomic damages.")]. This "evaluation" cited by Plaintiff refers to an "Auto Injury Evaluation" form dated February 23, 2021, wherein Ms. Douglas identified, *inter alia*, some of Plaintiff's then-existing

---

A. That's my understanding of that, yes.

[Doc. 26-1 at 40:17–24]. Plaintiff's other assertions regarding State Farm's purported *awareness* of her medical issues are similarly based on Ms. Douglas's review, during her deposition, of claim notes made by other State Farm adjusters. *Compare, e.g.*, [Doc. 26 at 3–4, ¶¶ 5–7 ("On September 11, 2020, State Farm was aware that [1] Plaintiff was suffering from injuries to her neck, back and pelvis, as well as PTSD symptoms[,] . . . [2] Plaintiff had seen her primary care physician, had undergone approximately 30 physical therapy and chiropractic appointments, and had been undergoing PTSD treatment approximately once per week[, and] [3] Plaintiff was unable to lift, do yard work, go on fishing trips or sit down without pain.")] *with* [Doc. 24-8 at 41:23–42:24 (Ms. Douglas's acknowledgment that another adjuster had documented in Plaintiff's claim notes that Plaintiff "had suffered injuries to her neck, back, and pelvis and that she had been diagnosed with PTSD; . . . had been to other PCP, PT about 30 times, osteopath – DC/PT, one times [sic] per week, and PTSD treatment one time per week; . . . [and] she told [the adjuster] she cannot do anything," including lifting, yardwork, "long trips to go fishing," and sitting)].

medical records. [Doc. 26-3]. However, "an insurer's evaluation of a claim at any particular time does not constitute an undisputed amount which must be paid under the policy." *Nyborg*, 2021 WL 662305, at *7 (first citing *Fisher v. State Farm Mut. Auto. Ins. Co.*, 419 P.3d 985, 988 (Colo. App. 2018) ("*Fisher I*"), *aff'd*, 418 P.3d 501; and then *Voland v. Farmers Ins. Co. of Ariz.*, 943 P.2d 808, 812 (Ariz. App. 1997)). And, in any event, the evaluation referenced by Plaintiff does not "clearly quantif[y]" the amount of Plaintiff's noneconomic damages as she claims. [Doc. 26 at 12]. Rather, it identifies a "Net Evaluation Range" that begins at "$0.00" but does not show an end range.[7] [Doc. 26-3 at 1]. In addition, the only medical bills documented in the evaluation form were the same ones that Plaintiff's counsel had already provided to State Farm in the demand letters (i.e., the economic damages Plaintiff is claiming). *Compare, e.g.*, [Doc. 24-13; Doc. 24-17] *with* [Doc. 26-3 at 2].[8]

Plaintiff's arguments simply do not raise a genuine factual dispute on these issues.

### 2. Failure to Adequately Investigate Plaintiff's Claim

Ms. Stanley also challenges State Farm's claims-handling process as part of her common law bad faith claim, arguing that State Farm failed to adequately investigate her claim or evaluate her damages before she filed suit, but "instead closed its claim while these damages were clearly still accruing." [Doc. 26 at 12, 13]. Relatedly, Ms. Stanley insists that "by December of 2020, State Farm knew Ms. Stanley had suffered both physical and psychological injuries and was continuing to receive treatment for these injuries" and yet, "[i]n the face of this information, State Farm chose to close the claim less than 6 months into the claim instead of continuing its

---

[7] The evaluation form submitted by Plaintiff redacts the latter portion of the "Net Evaluation Range." [Doc. 26-3 at 1]. The evaluation form also noted that Plaintiff had not demanded a specific amount in the February 11, 2021 demand letter. [*Id.*].

[8] As discussed above, and reflected in the evaluation form, the total amount of those bills had not exceeded the $25,000 policy limit that Plaintiff obtained from Progressive.

investigation." [*Id.* at 8]. These arguments regarding the closure of Plaintiff's claim are based on Plaintiff's assertion that "[o]n December 27th, 2020, Ms. Douglas and State Farm determined that Plaintiff had been fully compensated by the liability coverage and deactivated their file." [*Id.* at 5, ¶ 15]; *see also* [Doc. 26-1 at 77:14–23]. According to Plaintiff, a reasonable jury could find that State Farm acted improperly in its investigation and evaluation of Plaintiff's claim by "deactivat[ing] its UIM file despite being well aware that Plaintiff's damages were still accruing." [Doc. 26 at 15]; *see also* [*id.* at 12].

However, the record does not reflect that State Farm discontinued its investigation on December 27, 2020, as Plaintiff suggests. To be sure, on December 27, 2020, State Farm indeed notified Plaintiff in writing that "[a]t this time, with the information on file, we do not believe there is an Underinsured Motorist Exposure." [Doc. 24-15]. However, the letter continued that "[i]f you believe there is an exposure and submit additional documentation, please submit five years of prior records for your client. This will assist in the evaluation of the injuries sustained." [*Id.*]. And, as Plaintiff acknowledges, the letter also requested that she complete a medical authorization to release her information if she "wish[ed] for State Farm to secure the prior records." [*Id.*]; *see also* [Doc. 26 at ¶¶ 15–16 (Plaintiff's acknowledgment that, on December 27, 2020, State Farm "communicated to Plaintiff that if she was to provide any additional information then she would also need to provide prior medical records")]. In addition, although UIM Claims Specialist Ms. Douglas testified that she decided to "deactivate" Plaintiff's file after determining there was no UIM exposure, [Doc. 24-8 at 77:18–23], Plaintiff fails to cite any evidence showing that such "deactivation" amounted to a discontinuation of State Farm's investigation.[9] To the contrary,

---

[9] Ms. Douglas testified that deactivating a case "means that I put the claim in an . . . inactive status based on the information I have" and "I am still assigned to the cause of loss, but I don't have a constant reminder to review the file every so many days." [Doc. 24-8 at 79:5–12].

Plaintiff takes the position that "Ms. Douglas has *continued* to make claim evaluations since the litigation has been filed." [Doc. 26 at ¶ 38 (emphasis added)].

In sum, Plaintiff fails to raise a genuine factual dispute regarding the adequacy of State Farm's pre-suit investigation of her claims.

### 3.    State Farm's Request for Five Years of Medical Records

Plaintiff also suggests it was unreasonable for State Farm to request five years of medical records. As previously mentioned, in the letter on December 27, 2020 denying Plaintiff's request for UIM benefits, State Farm requested that "[i]f you believe there is an exposure and submit additional documentation, please submit five years of prior records" for Plaintiff. [Doc. 24-15]. In her Response to the Motion for Partial Summary Judgment, Ms. Stanley claims that this request for five years of prior medical records was arbitrary, and Ms. Douglas failed to document "a reasonable basis" for seeking those records. [Doc. 26 at 8–9]; *see also* [*id.* at 5, ¶ 17 ("Ms. Douglas does not recall her basis for requesting prior medical records nor did she document her basis in the claim file." (citing [Doc. 26-1 at 78:14–23]))].

To the extent Plaintiff references State Farm's medical records request in support of her common law bad faith claim, the Court declines to consider these arguments here. Indeed, Plaintiff references this issue in two sentences without any substantive discussion or citations to any authority establishing why a request for five years of medical records is per se unreasonable. *See* [Doc. 26 at 5, ¶ 17 ("Ms. Douglas does not recall her basis for requesting prior medical records nor did she document her basis in the claim file."); *id.* at 8–9 ("[State Farm] arbitrarily requested 5 years of prior medical records without documenting a reasonable basis for this request.")]; *see also United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner . . . are waived."); *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238,

1249 (10th Cir. 2015) (observing that a court may decline to consider argument which is unsupported and inadequately briefed).[10]

### 4. "Further Evidence of Delaying Benefits"

Plaintiff also claims that "further evidence of delaying benefits" is demonstrated by the fact that her counsel provided State Farm with signed authorization forms to release her medical records "just three days after requesting it on December 30, 2020," but "State Farm did not utilize the authorization to obtain documentation until February of 2021." [Doc. 26 at 12]; *see also* [Doc. 24-16]. Relatedly, Plaintiff argues that State Farm's UIM Claims Specialist, Ms. Douglas, knew that by deactivating Plaintiff's UIM claim file on December 27, 2020, she would not receive future communications from Plaintiff's counsel, which caused a delay between the date Plaintiff's counsel submitted the medical authorization (and the corresponding documents) on December 30, 2020, and the adjuster's ultimate review of those documents in February 2021. *See* [Doc. 26 at 5–6, ¶¶ 20–25]. According to Plaintiff, "[t]he delay in receiving authorization lies entirely with State Farm" and "[t]his conduct caused the investigation to stall and resulted in a delay in benefits being paid to Plaintiff." [Doc. 26 at 12].

Respectfully, Plaintiff's argument misstates the record. As an initial matter, it is undisputed that the *first* time that anyone at State Farm sent Plaintiff's counsel a medical authorization release form was on September 25, 2020—not December 27, 2020, as Plaintiff

---

[10] In any event, these arguments do not change the fact that Plaintiff fails to present any evidence showing that State Farm acted unreasonably in investigating her claim. Nor is the Court persuaded by Plaintiff's assertion that State Farm's request for five years of prior medical records was arbitrary. *See* [Doc. 26 at 9]. The evidence Plaintiff relies upon is the deposition testimony of Ms. Douglas, who testified that—based solely on her claim notes that she was asked to review at her deposition—"I can't tell you exactly why I was requesting five years of prior[]" records, but "based on prior claim handling, I'm assuming it was something within the medical records that made me believe that at the time." [Doc. 26-1 at 78:19–23].

suggests.  *See* [Doc. 24-6; Doc. 24 at ¶ 9; Doc. 26 at ¶ 9].  However, Plaintiff's counsel did not return the authorization form to State Farm until December 30, 2022—more than three months later—after State Farm reiterated its request on December 27, 2020.  *See* [Doc. 26-2 at 1, 4–6; Doc. 24-15].  Accordingly, this evidence contradicts Plaintiff's assertion that "[t]he delay in receiving authorization lies entirely with State Farm."  [Doc. 26 at 12].

In any event, Plaintiff appears to rest her argument on her assertion that upon receiving the medical authorization form on December 30, 2021, "State Farm could have obtained any missing medical records and bills for Plaintiff's treatment by utilizing the health insurance ledger[11] and the signed authorization it had received earlier that month."  [*Id.* at 5, ¶ 22 (citing [Doc. 26-1 at 105:3–14])].  However, as State Farm points out, the testimony upon which Plaintiff relies states that, "[h]ypothetically speaking," State Farm *could have* used the authorization to obtain additional information to evaluate Plaintiff's claims, not that State Farm *should have* done so under the circumstances of Plaintiff's case.  [Doc. 26-1 at 105:3–14].  Indeed, Plaintiff does not point to any industry standard against which State Farm's failure to obtain additional medical records for Ms. Stanley at that time was unreasonable.  *See Galusha v. Farmers Ins. Exch.*, 844 F. Supp. 1401, 1405 (D. Colo. 1994) ("The reasonableness of an insurer's conduct is based upon objective standards of conduct in the insurance industry.").

Likewise, the Court is not persuaded that the approximately six-week delay between State Farm's receipt of Plaintiff's medical authorization and Ms. Douglas's review of the same constitutes "further evidence of delaying benefits," as Plaintiff claims.  [Doc. 26 at 12].  Even

---

[11] The "health insurance ledger" here refers to Plaintiff's assertion that "[o]n December 7th, 2020, State Farm received a lien ledger from Plaintiff's health insurance which listed medical providers and billing amounts which totaled $14,219."  [Doc. 26 at 4, ¶ 13 (citing [Doc. 26-1 at 103:10–22])].

drawing all inferences in favor of Ms. Stanley with regard to Ms. Douglas's testimony, Ms. Stanley points to no authority—and this Court could not find any—to suggest a six-week delay would rise to the level of unreasonable conduct.

In sum, Plaintiff fails to raise a genuine factual issue to support that it was objectively unreasonable for State Farm to review Plaintiff's completed medical authorization and questionnaire between the end of December 2020 and the middle of February 2021.

### 5.    Post-Litigation Delay of Benefits

Finally, Ms. Stanley argues that "State Farm fails to address any post-litigation delay of benefits," noting that she "did not stop accruing bills and other damages when the lawsuit was filed" and "State Farm's duty to evaluate Plaintiff's damages did not cease when the lawsuit was filed." [*Id.* at 12–13]. State Farm counters that it's "duty to 'negotiate, settle, and pay' Plaintiff's claim was suspended" because a dispute existed regarding the value of Plaintiff's claim, and she chose to file suit. [Doc. 28 at 9]. It also contends that Plaintiff's position that State Farm "has acted unreasonably by not paying benefits and not producing post-litigation evaluations is not supported by Colorado law." [*Id.* at 9–10].

For support, Plaintiff cites the Colorado Court of Appeals' decision in *Southerland v. Argonaut Insurance Co.*, 794 P.2d 1102 (Colo. App. 1990). [Doc. 26 at 13]. There, the court held that evidence of an insurer's bad-faith conduct which occurred after the filing of a complaint may be admissible to show "a continuation of the same difficulties that preceded the filing of the complaint and were relevant as evidence of [the] defendant's habitual pattern in dealing with [the] plaintiff." *Southerland*, 794 P.2d at 1106. This Court finds *Southerland* distinguishable.

First, under Colorado law, "the duty to negotiate may be suspended when two conditions are met: (1) a genuine disagreement as to the value of an insured's claim; and (2) the initiation of adversarial proceedings, such as litigation." *Meadows v. Elec. Ins. Co.*, No. 15-cv-02524-MEH,

2016 WL 7868824, *8 (D. Colo. June 30, 2016) (citing *Sanderson*, 251 P.3d at 1217).  As discussed above, the undisputed facts show a disagreement as to whether the value of Plaintiff's claim exceeded her settlement payment from Progressive pre-litigation.  And there can be no dispute that as of February 16, 2021, adversarial proceedings had been initiated.  *See* [Doc. 5].

Second, "conduct after the filing of a complaint can be admissible if it is a continuation of the same difficulties that preceded the filing of the complaint and [is] relevant as evidence of a pattern of [the] defendant's bad faith dealings with the plaintiff."  *Meadows*, 2016 WL 7868824, at *8 (cleaned up) (citing *Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 552–53 (Colo. 1997)); *see also Southerland*, 794 P.2d at 1106 ("continued late payments and ongoing difficulties . . . were merely a continuation of the same difficulties that preceded the filing of the complaint and were relevant as evidence of [the] defendant's habitual pattern in dealing with [the] plaintiff").  But Plaintiff fails to substantively discuss, or point to any evidence of, State Farm's post-litigation conduct.  Instead, the entirety of her argument on this issue rests on her statement that "Ms. Douglas has continued to make claim evaluations since the litigation has been filed but has not provided any of that information to Plaintiff."[12]  [Doc. 26 at 7, ¶ 38]; *see also* [*id.* at 13 ("State Farm has not provided any information about the evaluations completed during this litigation nor has it paid any benefits to Ms. Stanley.").  Ms. Stanley also does not identify any alleged unreasonable conduct that State Farm engaged in pre-suit that is relevant to its post-suit conduct, apart from her general assertion that "State Farm has not provided any information about the evaluations completed during this litigation nor has it paid any benefits to Ms. Stanley."  [*Id.* at 13].

---

[12]  This statement also cuts against Plaintiff's assertion that "State Farm's duty to evaluate Plaintiff's damages did not cease when the lawsuit was filed."  [Doc. 26 at 13].

Likewise, Plaintiff fails to provide any authority to support her contention that it is unreasonable for State Farm to withhold its post-suit evaluations of her claim.  And, as State Farm points out in its Reply, *see* [Doc. 28 at 9–10], another court in this District recently rejected this same argument:

> [F]rom a practical standpoint, requiring production of post-litigation claim notes would necessarily result in inconsistent discovery obligations between parties. Once an insured files suit, insurers are required to defend against claims of breach of contract and bad faith, and they are subject to the discovery rules and deadlines set by courts.  If insurers are required to continue to evaluate claims post-litigation and provide information to plaintiffs, plaintiffs could simply circumvent discovery rules and deadlines by submitting new information and demanding an insurer's post-litigation analysis.  This is not what the law requires.  To hold otherwise would incentivize plaintiffs to rush to the courthouse to file a lawsuit and then continue to submit records to insurers in an attempt to avoid the discovery process.

*Johnston v. Standard Fire Ins. Co.*, No. 20-cv-02106-CMA-MEH, 2022 WL 1225311, at *4 (D. Colo. Apr. 25, 2022).  This Court adopts that same reasoning here.

In sum, the Court finds that Plaintiff has not raised a genuine dispute of material fact regarding State Farm's post-litigation conduct that would preclude summary judgment on her common law bad faith claim.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1)     Defendant's Motion for Partial Summary Judgment [Doc. 24] is **GRANTED**;

(2)     Judgment will be entered in favor of Defendant on Plaintiff's claims for statutory unreasonable delay or denial and common law bad faith breach of contract under Counts II and III, respectively, at the time in which final judgment is entered in this case;

(3)     Defendant's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) [Doc. 23] is **DENIED as moot**; and

(4)     A Telephonic Status Conference is **SET** for **April 6, 2023 at 10:30 a.m.**, for

purposes of setting dates for trial and a Final Pretrial Conference/Trial Preparation

Conference.  The Parties shall use the following dial-in information: 888-363-4749,

Access Code: 5738976 to participate at the designated time.

DATED:  March 13, 2023                                 BY THE COURT:

                                                       _____
                                                       Nina Y. Wang
                                                       United States District Judge